# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

B.A. CONSTRUCTION & MANAGEMENT,
INC., a Michigan corporation and B.A. REAL
ESTATE, L.L.C., a Michigan limited liability
company,

       Plaintiffs/Counter-Defendants,

                                      CASE NO. 04-73910

-vs-

                                      PAUL D. BORMAN
                                      UNITED STATES DISTRICT JUDGE

KNIGHT ENTERPRISES, INC.,
a Michigan corporation,

       Defendant/Counter-Plaintiff,

and

KNIGHT ENTERPRISES, INC.,
a Michigan corporation,

       Third Party Plaintiff,

-vs-

BELAL ABDALLAH, an individual, LOUBNA
ABDALLAH, an individual, NABIL BERRY,
an individual, and HALA BERRY, an individual,

       Third Party Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFF B.A. CONSTRUCTION & MANAGEMENT, INC. AND B.A. REAL ESTATE, L.L.C.'S MOTION FOR SUMMARY JUDGMENT FOR LIABILITY AS TO PLAINTIFFS' COMPLAINT

Now before the Court is Plaintiffs' Motion for Summary Judgment for Liability only as

1

to Plaintiffs' Complaint against Knight Enterprises. Having considered the entire record and having held a hearing on this motion, for the reasons that follow, the Court GRANTS Plaintiffs' Motion for Summary Judgment.

**I.    FACTS**

In this action, Plaintiff B.A. Construction & Management, Inc. ("BA Construction") and Plaintiff B.A. Real Estate ("BA Real Estate") (collectively "Plaintiffs") brought an eight count Complaint[1] on October 5, 2004 alleging a violation of the Petroleum Marketing Practices Act ("PMPA"), breaches of contract, promissory estoppel, and requesting injunctive relief.  BA Construction is a Michigan corporation doing business in Wayne County as a gasoline dealer. (Compl. ¶ 1).  BA Real Estate is a Michigan limited liability company doing business in Wayne County.  (*Id*. at ¶ 2).  Defendant Knight Enterprises ("Defendant") is a Michigan corporation doing business in Wayne County and is a wholesale supplier of gasoline products to dealers who operate gasoline stations. (*Id*. at ¶ 3, Def.'s Resp. 3).  On October 14, 2005, Plaintiffs filed the present Motion for Summary Judgment.  Defendant filed its response and Plaintiffs filed a reply. Defendant filed a counterclaim on November 1, 2004.

In January 2004, Plaintiffs and Belal Abdallah ("Abdallah"), President of BA Construction and BA Real Estate, entered into an Improvement Agreement and a Motor Fuel

---

[1]    Count I:         Violation of the Federal Petroleum Marketing Practices Act
Count II:        Breach of Contract of the Improvement Agreement
Count III:       Beach of Contract of the Motor Fuel Franchise Agreement
Count IV:       Injunctive Relief
Count V:        Injunctive Relief
Count VI:       Injunctive Relief
Count VII:      Injunctive Relief
Count VIII:     Promissory Estoppel

Franchise Agreement ("Franchise Agreement"). (Def.'s Resp. 3). During the negotiations of the agreement, Abdallah represented to Defendant that his gas station sold 125,000 gallons of gasoline per month. (*Id.*). Based on Abdallah's representations, Defendant worked out an arrangement with Citgo Petroleum Corporation ("Citgo") whereby Defendant would be reimbursed $130,000.00 over time from Citgo if Plaintiffs' station was branded,[2] e.g. if Plaintiffs purchased a minimum of 125,000 of gasoline per month and if the station's appearance met Citgo's specifications. In turn, Defendant agreed to give Plaintiffs a $130,000.00 signing bonus. These terms were placed in the Franchise Agreement and the Improvement Agreement. Plaintiffs and Defendant also signed a Line of Credit Agreement ("Credit Agreement") and a Mortgage for the property on which the gas station was located.

The Franchise Agreement states, in pertinent part:

> 25. No rebate on fuel will be paid during the terms of the contract. However an up front cash *signing bonus* will be paid by Knight Enterprises, Inc to the dealer of an amount of One Hundred thirty Thousand ($130,000) dollars issued *upon the formal acceptance* of the branded station by the major oil company.

(Pls.' Br. Ex. 1, Franchise Agreement ¶ 25) (emphasis added). The Improvement Agreement states:

> 2. <u>IMPROVEMENTS</u>: KNIGHT agrees to provide the following described

---

[2] Branding is when a gas station becomes affiliated with an oil company and puts up the oil company's name at the station. There are three phases of the branding process. The first phase consists of a request to be branded and once a positive response is received by Citgo, the station owner is allowed to place the necessary signage on the property. (Pls.' Br. Ex. 6, Knight Dep. 53-54). The second phase is when a station owner asks to be approved to supply and gets set up to accept credit cards. (Pls.' Br. Ex. 6, Knight Dep. 53-55). The final phase is the receipt of formal documentation stating that Citgo is giving a rebate on the location. (Pls.' Br. Ex. 6, Knight Dep. 55). All documents involved in the branding process are between Defendant and Citgo. (*Id.*).

> equipment and improvement or cash to be used to purchase improvements (collectively the "Improvements") on the Property at an agreed upon value of [$152,000].
>
>> Detail of Improvements
>> KNIGHT will provide an ID Price Sign, Image Dispensers & Canopy and paint poles and curbs = Twenty Two Thousand Dollars ($22,000) [and a] *Signing Bonus* of One Hundred thirty Thousand Dollars ($130,000).
>
> . . . .
>
> 3. Subject to the terms hereof, DEALER shall reimburse KNIGHT for the Value of the Improvements; provided, however, DEALER *shall not be obligated to reimburse* KNIGHT for the Value of the Improvements *so long as* during the Term, DEALER purchased for and delivered to the Retail Outlet the total requirement of Fifteen Million (15,000,000) gallons of KNIGHT supplied motor fuel (the "Volume").

(Pls.' Br. Ex. 4, Improvement Agreement ¶¶ 2, 4). The Franchise Agreement was to cover a term of 10 years. (Pls.' Br. 2). Defendant advanced Plaintiffs $30,000 of their signing bonus in reliance on the representations and contracts between the parties. (Def.'s Resp. 5).

Defendant also extended Plaintiffs a line of credit. (Def.'s Resp. 4). The line of credit was in the amount of two loads of gasoline ("back loads"). Under the Line of Credit Agreement ("Credit Agreement"), the first back load of gasoline was to be paid by Plaintiffs upon the delivery of the third load of gasoline. (*Id*.). This way, Plaintiff never had more that two unpaid loads of gasoline at one time. (*Id*.). Defendant alleges that Plaintiffs violated the Credit Agreement on February, 13, 1004, February 26, 2004 and March 9, 2004, when Plaintiffs wrote checks to Defendant that were returned due to insufficient funds . (*Id*.). After Plaintiff bought a load on March 13, 2004, Defendant made no shipments of fuel for two months. (Pls.' Br. Ex. 6, Knight Dep. 77: 6-12).

On March 24, 2004, the President of Defendant, Carroll Knight, sent Plaintiffs a letter

which indicated that all loads of fuel needed to be paid for with certified funds, i.e., on a cash basis, at or before the time of delivery. (*Id*. at 5; Def.'s Resp. Ex. C, Letter 03/24/04). The letter also stated that Defendant was aware that Plaintiffs have used other suppliers for gasoline while selling the fuel as a Citgo product, i.e., misbranding. (*Id*.). The requirement to pay for fuel with certified funds was rejected by Plaintiffs, who requested more credit. (*Id*.). Defendant refused to offer Plaintiffs additional credit. (*Id*.).

Between March 13, 2004 and May 17, 2004, Plaintiff did not purchase gasoline from Defendant. (Pls.' Br. Ex. 6, Knight Dep. 77: 6-12). During this time period, Plaintiff bought gasoline from other suppliers. Carroll Knight observed Plaintiffs unloading unauthorized gasoline into the tanks of Plaintiff's station. (Pls.' Br. Ex. 6, Knight Dep. 81: 1-11).

On April 6, 2004, Charles Roehl, an attorney for Defendant, sent Plaintiffs a letter terminating the Franchise Agreement. (Def.'s Resp. Ex. D, Letter 4/06/04). According to Carroll Knight, Defendant again sold motor fuel to Plaintiffs on May 17, 21 and 26, 2004. (Pls.' Br. Ex 6., Knight Dep. 80: 3-4). After May 26, 2004, Plaintiffs stopped ordering fuel from Defendant and allegedly continued to buy fuel from other suppliers. (*Id*. at 5). It is unclear when Plaintiffs removed or covered the Citgo name and symbol after they stopped ordering fuel from Defendant. On September 2, Defendant foreclosed on the property that is the subject of this lawsuit. Plaintiffs then filed their Complaint.

Plaintiff argues that the signing bonus was the consideration that they received for entering into the contracts with Defendant. But for the signing bonus, Plaintiff claims that they would not have entered into either the Franchise Agreement or the Improvement Agreement. Plaintiffs argue that Defendant breached the Franchise Agreement by failing to pay the signing

bonus.  Likewise, Plaintiffs contend that Defendant breached the Improvement Agreement by failing to pay the signing bonus.  Plaintiffs aver that Defendant did not comply with sections 2802 and 2804 of the PMPA, because Defendant did not give proper notice of cancellation, termination and/or non-renewal of the Franchise Agreement and Improvement Agreement, when they refused to sell Plaintiffs motor fuel.  Plaintiffs also assert that BA Construction was never a party to the Mortgage.  Plaintiff avers that BA Real Estate, as Mortgagor, was never loaned money by Defendant, and there was no consideration given by BA Real Estate for the Mortgage.  Therefore, Plaintiffs believe that the Mortgage is void.

Defendant responds that it was fraudulently induced into entering into agreements with Plaintiff.  Defendant contends that there was a mistake of fact that formed the basis for entering into the agreement.  Defendant also claims that Plaintiffs first breached or repudiated the contracts by: 1)  failing to purchase their minimum required monthly volumes during the first three consecutive months of the Franchise Agreement; 2) failing to buy their entire supply of products from Defendant; 3) having multiple drafts from Plaintiffs' account bounce due to insufficient funds.  Defendant further supports its position by arguing that formal approval by Citgo was a condition precedent to Defendant tendering the signing bonus.  Defendant asserts that the extension of credit in the Credit Agreement was given to Plaintiffs, as well as Abdallah.  Further, Defendant claims that even if Plaintiffs were entitled to $100,000 allegedly owed to them, Plaintiffs would have to repay Defendant $130,000.00 for failing to fulfill the terms of the contract.

### III.    ANALYSIS

**a.     Standard**

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the non-moving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-

11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

      **b.**    **Breach of the Franchise Agreement and the Improvement Agreement**

Plaintiffs argue that Defendant agreed to pay them $130,000.00 up front as a signing bonus pursuant to both the Franchise Agreement and the Investment Agreement. Plaintiffs also argue that Citgo branded the station on March 16, 2004. Plaintiffs claim that Defendant's refusal to tender the remaining amount of the signing bonus owed to them at that time was a breach of this agreement.

Defendant argues Plaintiffs misrepresented that they historically sold 125,000 gallons of fuel per month, when they only sell 47,000 gallons per month, and thus the contracts are void. Defendant contends that the reason why it entered into the contracts and promised an advance of the $130,000.00 signing bonus, was because Plaintiffs stated that they sold 125,000 gallons of gas historically, and that they would purchase and sell 125,000 gallons of gas per month for ten

years.  Defendant argues that the amount of gas Plaintiffs' sold was a mistake of fact, which formed the basis for making the agreement.  Defendant claims that Plaintiffs were first to breach the contract by failing to purchase the125,000 gallons of fuel, failing to buy their entire supply of products from Defendant; and by having multiple drafts from Plaintiffs' account bounce due to insufficient funds.  Defendant also argues that the formal acceptance of Plaintiffs' branded station was a condition precedent to Defendant tending the $130,000.00 and Plaintiffs' station was never formally accepted.

"A plaintiff seeking to recover on a breach of contract theory must then prove by a preponderance of the evidence[:] the terms of the contract, that the defendant breached the terms of the contract, and that the breach caused the plaintiff's injury." *In Re Brown*, 342 F.3d 620, 628 (6th Cir. 2003).

To determine whether the contract was breached and by which party, the Court looks to the terms of the contracts.  The terms in the Franchise Agreement state that the $130,000.00 signing bonus will be paid when the branded station is formally accepted by a major oil company. (Pls.' Br. Ex. 1, Franchise Agreement ¶ 25).  The Improvement Agreement states that Plaintiffs were not obligated to reimburse Defendant for the value of the improvements as long as Plaintiffs purchased the total fifteen million gallons of motor fuel supplied by Defendant. (Pls.' Br. Ex. 4, Improvement Agreement ¶ 4).

Regarding the Franchise Agreement, Plaintiffs argue that it is undisputed that Citgo formally accepted Plaintiffs' station as a branded station on March 16, 2004. (Pls.' Br. 9). Plaintiff offers the affidavit of Robert Franczkowski ("Franczkowski"), a Citgo Sales Manager (Pls.' Br. Ex. 2), and a letter from Franczkowski stating that the branding had been completed.

(Pls.' Br. Ex. 3). The Franchise Agreement reads "that upon the formal acceptance of the branded station," the signing bonus should be paid. (Pls.' Br. Ex. 1, Franchise Agreement ¶ 25). The only evidence produced by Defendant to the contrary was Knight's deposition testimony that he was informed by Franczkowski that the final approval date by Citgo was August 4, 2004. (Pls.' Br. Ex. 6, Knight Dep. 69: 4-23).

The Court concludes that based on the "black and white" letter evidence from Citgo, tying directly to the contract, that Plaintiffs' station was branded on March 16, 2004, meeting the formal acceptance provision of the Franchise Agreement. As such, viewing the facts in a light most favorable to Defendant, but nevertheless interpreting the clear language of the contract, there is no genuine issue of material fact as to whether the formal acceptance provision of the Franchise Agreement was met and whether Defendant breached the Franchise Agreement due to this requirement. Consequently, the Court grants Plaintiffs' Motion for Summary Judgment as to liability on Count III (Breach of Franchise Agreement).

Regarding the Improvement Agreement, Plaintiffs argue that Defendant's failure to pay the signing bonus under the terms of the Agreement is a breach of those terms. The payment terms in the Improvement Agreement state that there is no obligation on the part of Plaintiffs to repay the signing bonus "so long as during the term" Plaintiffs purchase and deliver to their station the fifteen millions gallons of motor fuel supplied by Defendant. It follows that if Plaintiffs did not purchase the total amount of fuel, they would be obligated to reimburse Defendant for the bonus money paid to them. It is undisputed that Plaintiffs did not purchase the entire fifteen million gallons of motor fuel from Defendant. However, the purchase of the fifteen million gallons of fuel over the life of the franchise agreement is not a condition precedent to

Defendant's obligation to pay the signing bonus under the Improvement Agreement. Had the purchasing of motor fuel been a condition precedent, the provision in the Improvement Agreement would have, at the very least, been couched in terms of monthly fuel requirements instead of the total fifteen million gallons.

Defendant responds that the contract was void due to Plaintiffs' fraudulent representations, a unilateral mistake of fact, or that Plaintiffs were first in time to breach the Franchise Agreement and Improvement Agreement.

Fraud can occur by open, false assertions. *Hord v. Environmental Research Inst.*, 463 Mich. 399, 412 (2000). "The general rule is that to constitute actionable fraud it must appear: 1) That Defendant made a material representation; 2) that it was false; 3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; 4) that he made it with the intention that it should be acted upon the plaintiff; 5) that plaintiff acted in reliance upon it; and 6) that he thereby suffered injury." *United States Fid. and Guar. Co. v. Chase Black*, 412 Mich. 99, 114 (1981). Contracts induced by fraud are voidable. *M&D, Inc. v. McConkey*, 226 Mich. App. 801, 806 (1997).

Plaintiffs represented to Defendant that they sold 125,000 gallons of gas a month. Based on this representation, Defendant entered into the Franchise Agreement and Improvement Agreement with Plaintiff. The requirement that Plaintiffs purchase 125,000 gallons of gas per month, the requirement that Plaintiff purchase fifteen million gallons of fuel over ten years, and Defendant's agreement to pay the signing bonus, were all based on Plaintiffs' representation. However, Defendant's failure to pay entire signing bonus adversely impacted Plaintiff's ability to buy the necessary monthly amount of gas and adequately market itself to increase consumer

consumption. Therefore, viewing the facts in a light most favorable to Defendant, there is no genuine issue of material fact whether the contracts were voidable due to Plaintiffs' fraudulent misrepresentations.

Defendants' alleged unilateral mistake of fact argument also does not save it from summary judgment. A mistake is "some unintentional act, omission, or error arising from ignorance, surprise, imposition or mis-reality." BLACK'S LAW DICTIONARY 1001 (6th ed. 1990). "A mistake of fact is a mistake not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in . . . (2) belief in the present existence of a thing material to the contract which does not exist, or in the past existence of such a thing which has not existed." *Id*. A unilateral mistake is a mistake by one party and is usually not reason for relief from the agreement. *Id*. at 1002. *See* RESTATEMENT (SECOND) OF CONTRACTS § 3, Comment a ("Courts have traditionally been reluctant to allow a party to avoid a contract on the ground of mistake, even as to a basic assumption, if the mistake was not shared by the other party."). Contract rescission is a remedy for a unilateral mistake induced by fraud. *Kruger v. Agnor*, 321 Mich. 131, 135-36 (1948). "It is well settled that if a material unilateral mistake is known to the other party or . . . the other party had reason to know of it, the party making the mistake has a right to recision." *C. N. Monroe Mfg. Co. v. United States*, 143 F. Supp. 449, 451 (1956).

Viewing the facts of the instant case in a light most favorable to the non-moving party, there was no unilateral mistake of fact made by Defendant. There was no mistake made when drafting and signing the contract. Both parties were aware of the terms and there was no unintentional act, omission, or error arising from ignorance, surprise or imposition. Therefore, there is no genuine issue of material fact as to whether there was a unilateral mistake of fact.

Likewise, Defendant's argument that Plaintiffs were first in time to breach the Franchise Agreement and Improvement Agreement does not give it relief from summary judgment. Defendant contends that Plaintiff failed to buy their required monthly volume, failed to buy their entire supply of products, and failed to pay for products on time, all as per the Franchise Agreement and the Improvement Agreement.

"The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650 (1994). However, if the breach is not substantial, then the rule does not apply. *Id*.

As stated above, buying the required monthly volume, the entire supply of products, and paying for products on time, are not condition precedents to Defendant paying the signing bonus. Therefore, Plaintiffs' were not first to breach the Improvement Agreement by failing to perform the above mentioned acts. Accordingly, the Court finds a genuine issue of material fact as to whether Defendant was the first to breach the contract.

Viewing the above facts in a light most favorable to the Defendant, there is no genuine issue as to whether Defendant breached the Improvement Agreement. Accordingly, the Court grants Plaintiffs' Motion for Summary Judgment as to liability on Count II (Breach of Improvement Agreement).

    **c.**    **Violation of the PMPA**

Plaintiffs argue that Defendant refused to supply them with motor fuel, without the notice required by section 2802 and 2804 of the PMPA. Plaintiffs assert that these provisions are to be strictly construed. On the other hand, Defendant argues that it had the right to terminate the

13

franchise agreement for failure to pay and for misbranding of motor fuel under the PMPA.

Under the PMPA, a party can terminate a franchise if 90 days notice of termination is given and valid reasons are provided. 15 U.S.C. § 2802(b)(1) and 2804(a)(2). However, when it is not reasonable for the franchisor to furnish 90 days notice, the franchisor must give notification to the franchisee on "the earliest date [which is] reasonably practicable." 15. U.S.C. § 2804(b)(1)(A).

Defendant sent a letter to Plaintiffs on April 6, 2004 which immediately terminated the franchise relationship. Defendant argues that immediate termination was necessary because it was clear that Plaintiffs were not going to buy their entire supply of product or buy their required monthly amount. Additionally, Defendant contends that it was clear Plaintiffs were not going to pay according to terms and were misbranding their fuel.

In *Marathon Petroleum Co. v. Pendleton*, 889 F.2d 1509 (6th Cir. 1989), the gas station franchisee purchased gas and other station products from the franchisor but became delinquent on his rent. *Id*. at 10. The franchisor sent a 10 day notice of termination to the franchisee and filed a declaratory action against the franchisee seeking a declaratory judgment that the franchise was terminated under the PMPA. *Id*. The Sixth Circuit upheld the lower court's ruling that the short notice was reasonable because the franchisee was losing interesting in running the station, maintained inadequate gasoline supplies and was chronically late making payments

In *Equilon Enterprises, L.L.C. v. Rahim, Inc.*, 2003 WL 22598325 (6th Cir. Nov. 7, 2003) (unpublished), a gas station sought review of a district court's ruling, of a summary judgment motion in favor of the franchisor, on the gas station's claim that the franchise was terminated in violation of the PMPA. *Id*. at *1. The franchisor sent notice to the gas station that the franchise

14

was immediately terminated. *Id*. at *13. The court found no reasonable juror could find that the minimal notice was inappropriate, given that: the gas station believed it was entitled to a "rent discount in perpetuity"; that the franchisor suffered loss, and; was likely to suffer additional loss if it was required to supply fuel to the gas station for 90 days. *Id*; *see also The Wisser Co., Inc. v. Mobil Oil Corp.*, 730 F.2d 54, 60 (2nd Cir. 1984) (finding that immediate termination of a franchise was proper because there was "no reason to believe that [the gas station] would not have used the [90 days] to continue its alleged misbranding to its profit.").

The instant case is unlike both *Pendleton* and *Rahin*. Here, Defendant claims that it was apparent from Plaintiffs' January and February purchases of gasoline that they were not meeting the purchase requirement of 125,000 gallons per month stated in the Agreements and would fail to buy the total amount of fifteen million gallons. Defendant also contends that Plaintiffs refused to pay by certified funds upon the delivery of the fuel. However, as stated above, Plaintiff's inability to purchase the required amount of fuel was directly related to Defendant's failure to pay Plaintiffs the full amount of the signing bonus. There is no evidence that the Plaintiffs were losing interest in running the station, failing to maintain adequate gasoline supplies, or that they believed they were entitled to a rent discount in perpetuity.

Even given the facts in a light most favorable to the Defendant, there is no genuine issue of material fact whether minimal notice was appropriate. In this case, Defendant should have provided ninety days notice to Plaintiff and Defendant failed to do so. Accordingly, the Court grants Plaintiffs' Motion for Summary Judgment as to liability on Count I (Violation of the PMPA).

  **d.**   **Setting Aside the Foreclosure Sale**

Plaintiffs contend that BA Construction entered into a Credit Agreement with Defendant and that BA Real Estate, in conjunction with the Credit Agreement, entered into a Mortgage in favor of Defendant for the gas station property.  Plaintiffs assert that BA Construction was never made a party to the Mortgage and never had an interest in the Mortgage.  Plaintiffs aver that under the Credit Agreement, Defendant agreed to sell motor fuel to BA Construction on credit.  Plaintiffs argue that BA Real Estate was never given an advance or loaned money by Defendant, and therefore, there was no consideration given by BA Real Estate for the Mortgage.  It is Plaintiffs' contention that as a result, the Mortgage should fail as it is void because; (1)  no consideration passed; and (2) if the court finds that the Mortgage is supported by consideration, the mortgage is invalid because BA Construction never executed a Line of Credit Note, Demand Promissory Note, or a Mortgage Note.  Plaintiff also claims that there was no signed Line of Credit given for the purchase of motor fuel.

Defendant argues that BA Construction, BA Real Estate and Belal Abdallah are "Borrowers" under the Credit Agreement, as Abdallah signed the document three times - once for each party.  Further, Defendant argues that the Mortgage was to secure the extension of credit given in the Credit Agreement.  Defendant also argues that the Franchise Agreement is secured by the Mortgage.  Defendant avers that there was a Promissory Note signed by Abdallah for the purchase of petroleum products.

Though Plaintiffs claim that BA Real Estates is not a party to the Credit Agreement, the Credit Agreement is signed by Abdallah three times - once individually, once as President of BA Real Estate, and once as President of BA Construction.  Plaintiffs and Abdallah signed the Credit Agreement as "Borrowers."  Therefore, the Court finds that the Credit Agreement applies to

16

Plaintiffs and Abdallah.

Likewise, only BA Real Estate and Abdallah are mentioned in the Mortgage preamble, but Abdallah signed the Mortgage three times as Mortgagor; once individually, once as President of BA Real Estate, and once as President of BA Construction. Further, the act of BA Real Estate and Defendant signing the Mortgage would have been unnecessary if BA Construction was not a party to the Mortgage and BA Real Estate was not a party to the Credit Agreement, because the Mortgage would not be security for the Credit Agreement.

According to the Mortgage, it was the intention of the parties for the Mortgage to be the security for the Credit Agreement. The text of the Mortgage declares that:

> in consideration of the premises and the extension of credit hereinabove set forth, to secure to Mortgagee the repayment of advances extended under the *terms of the Line of Credit Agreement* and Line of Credit Promissory Note, with interest thereon, and to secure any sums due or which may later become due from Mortgagor to Mortgage[e] and to secure the performance of any guaranty given by Mortgagor to Mortgagee and the payment of all other sums with interest thereon advanced in accordance therewith to protect the security of the Mortgage and the performance of covenants and agreement of the Mortgagor herein contained . . . .

(Pls.' Br. Ex. 8, Mortgage 1) (emphasis added). The reference to the Credit Agreement suggests that the Mortgage was security for the Credit Agreement.[3] Therefore, the Court finds that Plaintiffs and Abdallah are the Mortgagors under the Mortgage and that the Credit Agreement was consideration for the Mortgage.

The Franchise Agreement states that Defendant would extend two back loads of fuel to

---

[3] Defendant claims that there was a Promissory Note signed by the parties, while Plaintiff argues that Abdallah does not remember signing one. Defendant cannot locate the above mentioned Promissory Note. Defendant does not mention what was included in the promissory note.

17

Plaintiffs. Plaintiffs concede that the under the Credit Agreement, Defendant agreed to sell motor fuel to them on credit. However, the amount of credit extended by the Credit Agreement is not mentioned within the document. The Credit Agreement states that it is an "event of default" if "any representation or warranty made in any of the loan documents shall provide to be untrue or inaccurate in any material respect as of the date on which a such representation or warranty is made" is an "event of default."[4] (Pls.' Br. Ex. 7, Credit Agreement 1). It is not clear whether the Franchise Agreement is a "loan document" under this term. The Credit Agreement only mentions that "it is being signed in conjunction with, but not limited to Security Agreement, Personal Guaranty, Improvement Agreement, Motor Fuel Supply Agreement, UCC Financing Statement . . ., wherein . . . a default on any one automatically constitutes a default on any and all other agreements entered into between the parties."[5] (*Id.*).

A reasonable jury could find that the back loads were extended through the Credit Agreement, and that the Credit Agreement, signed by all of the parties, was the security for the Mortgage. It follows that the Credit Agreement and the Franchise Agreement were tied to each other. If Plaintiffs breached the Franchise Agreement, then Defendant could foreclose on the Mortgage, which was security for the Credit Agreement.

The Court finds that, viewing the facts in a light most favorable to the Defendant, a

---

[4] In the event of default, there is an Acceleration Clause in the Credit Agreement which states that the lender may declare principal and all interest due and payable. Defendant notified Plaintiffs and Abdallah of the acceleration of the outstanding balance on June 23, 2004.

[5] The Credit Agreement states that "to secure repayment of all obligations . . . of Borrower to Lender, Borrower agrees to execute contemporaneously . . . the following documents: Security Agreement covering the assets itemized on Exhibit "A" and financing statements related there." (Pls.' Br. Ex. 7, Line of Credit Agreement ¶ 9). However, it is unclear whether "Exhibit A" is in reference to the Mortgage executed by the parties.

reasonable jury could find that the Mortgage was security for the Line of Credit Agreement. However, as the Court found above that Plaintiffs did not breach the Franchise Agreement, Plaintiffs were not required to repay the back loads they received on credit until the completion of the Franchise Agreement. As a result, Defendant is not entitled to foreclose on the Mortgage because repayment was unnecessary. Accordingly, the Court grants Plaintiffs' Motion for Summary Judgment as to liability on Counts IV - VII and sets aside the foreclosure sale.

### III. CONCLUSION

For the reasons stated, the Court GRANTS Plaintiffs' Motion for Summary Judgment as to liability.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 11, 2006

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 11, 2006.

S/Jonie Parker
Case Manager