UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


B.A. CONSTRUCTION &
MANAGEMENT and B.A. REAL
ESTATE, LLC,

        Plaintiffs /              CIVIL ACTION NO. 04-73910
        Counter-Defendants,

    v.                        MAGISTRATE JUDGE VIRGINIA M. MORGAN

KNIGHT ENTERPRISES, INC.,

        Defendant / Counter-Plaintiff /
        Third-Party Plaintiff

    v.

BELAL ABDALLAH, LOUBA ABDALLAH,
NABIL BERRY, and HALA BERRY,

        Third-Party Defendants

_____/


**OPINION FINDING IN FAVOR OF KNIGHT ENTERPRISES, INC.**

**I. Introduction**

This case arises out of a series of contracts[1] between B.A. Construction and Management, Inc. and B.A. Real Estate, LLC (hereinafter "BA"), through their president Dr. Belal Abdallah, and Knight Enterprises, Inc. (hereinafter "Knight"). The parties have cross-claims alleging, at least in part, breach of contract and Knight also brought a third-party complaint against Dr. Abdallah, Loubna Abdallah, Nabil Berry and Hala Berry, alleging that those four individuals personally guaranteed BA's debts under the contracts. Following remand from the Sixth Circuit, the parties consented to this Court's authority to conduct all proceedings, including trial, the entry of final judgment, and all post-trial proceedings (D/E #141). On April 1, 2011 and April 19, 2011, a bench trial was held in this matter. For the reasons discussed below, this Court now concludes:

> (1)  BA never submitted and Knight never approved any plans for the Retail Outlet. Accordingly, the second condition precedent for payment of the signing bonus was not satisfied and Knight did not substantially breach the contracts by failing to pay BA the signing bonus.

> (2)  BA substantially breached the contracts first by failing to purchase the minimum amount of fuel each month, having checks returned for insufficient funds, failing to pay for fuel, and purchasing fuel from other suppliers.

> (3)  Knight's expectation or liquidated damages are too difficult or speculative to determine, and it should instead be awarded reliance damages in the amount of $67,861.03, plus interest.

---

[1]The contracts include: (1) the Improvement Agreement; (2) Motor Fuel Franchise Agreement (the Franchise Agreement); (3) Line of Credit Agreement; (4) Mortgage for the Real Property; and (5) Personal Guaranties. However, they all reference each other, are contemporaneous, and relate to the same transactions. Accordingly, they can be construed together. <u>See</u>, *e.g.*, <u>Tomecek v. Bavas</u>, 482 Mich. 484, 493, 759 N.W.2d 178, 184 (Mich. 2008).

(4)  Bela Abdallah, Loubna Abdallah, Nabil Berry and Hala Berry each personally and individually guaranteed BA's debts under the contracts. Accordingly, those individuals would be liable if BA is unable to satisfy the judgment.

## II. Background

### A. Facts

In January of 2004, Knight and BA entered into a business relationship with each other. Carroll Knight, the owner and president of Knight, owns 45 gas stations and supplies fuel to over 50 other stations.  Dr. Abdallah owned a gas station at 1727 Southfield Road in Lincoln Park, Michigan.  Moreover, as testified to by Dr. Abdallah, Nabil Berry was his unofficial business partner at the time.

Carroll Knight testified that, during negotiations, Dr. Abdallah told him that the gas station sold 125,000 gallons of gas a month, which was a good amount in Carroll Knight's view. Dr. Abdallah, on the other hand, testified that the gas station was selling 120,000 to 125,000 gallons of gas a month when he first purchased it in 1997.  However, according to Dr. Abdallh, after undertaking an extensive remodeling of the gas station over a number of years, the gas station was only half operational for a few months prior to the agreements with Knight.  Dr. Abdallah also testified that he told Carroll Knight about the operation of the gas station and that it was going to take some time to get back to needing 125,000 gallons or more a month.

In January 2004, Plaintiffs and Belal Abdallah, President of B.A. Construction and B.A.

Real Estate, entered into an Improvement Agreement and a Motor Fuel Franchise Agreement

("Franchise Agreement").  The Franchise Agreement states, in pertinent parts:

2. Term

The term of this Agreement shall be for Ten (10) years . . . . The Term of this
Agreement shall be automatically extended until DEALER purchases the total
gallons required in this Agreement.

3. Supply of Motor Vehicle Fuel

> 3.1. Purchase of Supply. DEALER agrees to purchase from
> KNIGHT . . . one hundred percent (100%) of DEALER'S
> requirements of motor fuels sold . . . . DEALER further agrees that
> one hundred percent (100%) of its total requirements shall not be
> less than One Hundred Twenty Five Thousand (125,000) gallons
> of motor fuels for each month during the term hereof. The total
> gallons of Motor Fuel required under this Agreement will be
> [12,000,000].[2]

* * *

3.3 Failure to Purchase All Motor Vehicle Fuels From KNIGHT.  DEALER
understands and agrees that the purchase of products from KNIGHT, for the
entire Term of this Agreement, is the consideration for KNIGHT to enter into this
Agreement.  DEALER agrees to pay or cause to be paid to KNIGHT the
following: Two cents (.02) per gallon on all gallons of petroleum products
purchased from any other supplier other than KNIGHT and sold from the
Property, during any monthly period for the Term herein . . .

* * *

22. This Motor Fuel Franchise Agreement is being signed in conjunction with, but
not limited to, Security Agreement, Line of Credit Agreement, Personal Guaranty,

---

[2]With respect to the total amount to be purchased, the parties crossed out the "15 Million
(15,000,000) gallons" originally provided in the standard contract form and wrote in 12 million
gallons.  The parties also wrote in that the term of the contract would be extended until the
gallon obligation was met if it was not reached in the 15 year period.

Improvement Agreement, Motor Fuel Supply Agreement, UCC Financing Statement and Agreement to Cross Collateralize, wherein all terms and conditions are being cross collateralized and a default on one automatically constitutes a default on any and all other agreements entered into by the parties.

* * *

25. No rebate on fuel will be paid during the terms of the contract. However an up front cash signing bonus will be paid by Knight Enterprises, Inc to the dealer of an amount of One Hundred thirty Thousand ($130,000) dollars issued upon the formal acceptance of the branded station by the major oil company.

(Franchise Agreement, ¶¶ 2, 3, 22, 25).  In paragraph 3.2 of the Franchise Agreement, dealing with terms and methods of payment, the parties also wrote in that Knight would extend two back loads of credit.  (Franchise Agreement, ¶ 3.2).  Both Carroll Knight and Dr. Abdallah testified that they agreed Knight would extend two back loads of credit, whereby BA would only be billed for the first delivery after the third delivery was made, the second delivery after the fourth delivery was made, and so on.  According to Carroll Knight's testimony, while the Franchise Agreement reflected that BA was suppose to purchase 125,000 gallons per month and 12 million gallons over 15 years, not all loads would be for the same amount of fuel or would cost the same. BA was to order what it wanted while the price would depend on the oil companies' prices and formulas.

The Franchise Agreement also contained a liquidated damages provision:

It is agreed that any repudiation of this Agreement and failure to purchase those minimum quantities by Dealer will result in serious losses to Knight.  Dealer and Knight acknowledge that the amount of losses will be difficult to determine.  It is therefore agreed, upon any repudiation by Dealer, Dealer shall pay to Knight as liquidated damages, three cents per gallon multiplied by the minimum gallons set forth in paragraph 3.1.  The damages here liquidated shall not affect any other right and remedies as Knight may have under this Agreement and under applicable law, including, but not limited to PMPA and the Uniform Commercial Code.

(Franchise Agreement, ¶ 20).  With respect to that liquidated damages provision, Carroll Knight

testified that those damages would be "computed at three cents a gallon for unpurchased fuel

based on the contract."

The Improvement Agreement, executed the same day as the Franchise Agreement, states

in part:

> 2. <u>IMPROVEMENTS</u>. KNIGHT agrees to provide the following described
> equipment and improvement or cash to be used to purchase improvements
> (collectively the "Improvements") on the Property at an agreed upon value of
> [$152,000].
>
>> <u>Detail of Improvements</u>
>> KNIGHT will provide an ID Price Sign, Image Dispensers &
>> Canopy and paint poles and curbs = Twenty Two Thousand
>> Dollars ($22,000) [and a] Signing Bonus of One Hundred thirty
>> Thousand Dollars ($130,000).
>
> * * *
>
> 3. <u>PAYMENT</u>.   Subject to the terms hereof, DEALER shall reimburse KNIGHT
> for the Value of the Improvements; provided, however, DEALER shall not be
> obligated to reimburse KNIGHT for the Value of the Improvements so long as
> during the Term, DEALER purchased for and delivered to the Retail Outlet[3] the
> total requirement of Fifteen Million (15,000,000) gallons of KNIGHT supplied
> motor fuel (the "Volume").
>
> * * *
>
> 7. APPROVALS.
>
> A. KNIGHT'S obligations and performance hereunder are subject to its approval
> of the plans and designs for the Retail Outlet . . . . DEALER and KNIGHT
> acknowledge and agree that KNIGHT'S review and approval of plans and designs
> are primarily for the purpose of ensuring that the appearance of the Retail Outlet
> at which KNIGHT'S petroleum products will be sold and It's [sic] Supplier's

---

[3]The term "retail outlet" is defined in the Improvement Agreement as "the real property
located at ... 1727 Southfield Road, Lincoln Park, MI 48146," the location of plaintiffs' gas
station.

trademark and brand names displayed will maintain the integrity and value of
such trademark or brand names.

(Improvement Agreement ¶¶ 2, 3, 7A).

With respect to the signing bonus discussed in both of the above agreements, Carroll
Knight testified that payment of the signing bonus was contingent on both Citgo and Knight
approving BA's station and plans. While the plans could have been submitted verbally, Knight
was looking for blueprints or a business plan to improve inside sales. For Carroll Knight, such
plans would confirm that BA had credibility, reflect how it was going to do business, and
demonstrate that it was going to be in business for a long time.

BA and Knight also executed a Line of Credit Agreement ("Credit Agreement") and
mortgage for the property on which the gas station was located in order to secure plaintiffs'
obligations under the Credit Agreement. However, the portion of the Credit Agreement
identifying the maximum amount of credit was left blank.

In conjunction with the above contracts, the individual third-party defendants also
allegedly signed guaranties of BA's debts under the contracts. On January 13, 2004, Abdallah
allegedly signed a guaranty, and on March 2, 2004, Loubna Abdallah, Nabil Berry and Hala
Berry allegedly signed guaranties, which secured the extension of credit from Knight to BA.
Knight's Exhibit #105 lists Hala Berry as the Debtor and, as stipulated by the parties, is signed
by Loubna Abdallah. Knight's Exhibit #106 lists Belal Abdallah and Nabil Berry as the Debtors

-7-

and, as acknowledge in his testimony, is signed three times by Belal Abdallah: once for each plaintiff and once individually

Knight's Exhibit #107 is a guaranty securing the extension of credit from Knight to Nabil Berry in his individual capacity. The guaranty is purportedly signed by Nabil Berry, but Nabil Berry denied signing such a form in a deposition submitted at trial.  However, the signature was notarized by Wahab Ismail and Ismail testified at trial that he would not have notarized the signature without verifying the identity of the person signing and actually observing the signing. Additionally, Nabil Berry previously stated in an earlier deposition that he signed the form.[4]

Knight's Exhibit #104 is another guaranty securing the extension of credit from Knight to Nabil Berry in his individual capacity. The guaranty is purportedly signed by Hala Berry and the guaranty is an exact copy of Nabil Berry's guaranty, *e.g.*, Nabil Berry's name is even printed under the signature line. The only difference between the two guaranties is that, purportedly, Nabil Berry signed one and Hala Berry signed the other.  Hala Berry denied signing such a form in a deposition submitted at trial.  However, her signature was notarized by Wahab Ismail and Ismail testified at trial that he would not have notarized the signature without verifying the identity of the person signing and actually observing the signing.  Additionally,

---

[4]Nabil Berry Dep. I. pp. 30-39; attached as Exhibit B to D/E #61.

Nabil Berry previously stated in an earlier deposition that he provided the form to his wife for her to sign.[5]

On January 20, 2004, prior to any gas being delivered, Knight issued a $30,000 check to BA. According to Carroll Knight, he issued the check because Dr. Abdallah "begged and pleaded for it" and the money was to be repaid if the contracts were unfulfilled. The remaining $100,000 of the signing bonus was never paid. Carroll Knight testified that he did not pay the $100,000 because BA was not meeting its requirements for ordering gas, its checks were being returned because of insufficient funds, and Dr. Abdallah never submitted any plans for the Retail Outlet. Knight acknowledges that he and Dr. Abdallah had some conversations regarding Dr. Abdallah's ideas for adding a fast food station, but he also asserts that Dr. Abdallah never submitted any specific plans for what the money would be used for. Carroll Knight further testified that other issues between the parties, such as BA's failure to buy gas, took precedent in his mind over the plans for the Retail Outlet and the signing bonus. However, as demonstrated in plaintiffs' Exhibits #1 and #2, Carroll Knight's 2004 affidavit and the counterclaim in this action both provide that the signing bonus had not been paid because Citgo had not approved the gas station for branding. Moreover, as previously found by the Sixth Circuit and now

---

[5]Nabil Berry Dep. I. pp. 30-39; attached as Exhibit B to D/E #61.

acknowledged by Carroll Knight, Citgo did approve the gas station for branding on March 12, 2004.[6]

Dr. Abdallah testified that, when discussing the contracts, he and Carroll Knight spoke about his desire to add a fast food restaurant and pharmacy to the gas station.  According to Dr. Abdallah, Carroll Knight said that the plan was good and that Dr. Abdallah would get the money after Citgo branded the station   He did not say that he needed to see anything in writing.  Dr. Abdallah further testified that he spoke with someone from Blimpie's about putting a franchise in the gas station, but he never informed Carroll Knight of that discussion.

Pursuant to the Improvement Agreement and as displayed as part of Knight's Exhibit #108, Knight paid $6,281.33 to contractors for work at the gas station and $6,035.50 to Citgo for materials, for a total amount of $12,316.83, between January 28, 2004 and March 5, 2004.  Carroll Knight testified that BA never reimbursed Knight for that imaging work or materials.  That testimony is uncontradicted.

With respect to the delivery of fuel, Carroll Knight testified that the invoice date for a delivery of fuel is not necessarily the delivery date and the actual delivery may have occurred up

_____

[6]As earlier found by the district judge, branding is when a gas station becomes affiliated with an oil company and puts up the oil company's name at the station.  There are three phases to the branding process.  The first is the request to be branded.  Once a positive response is received, the station owner is allowed to place the necessary signage on the property.  The second phase is when the station owner asks to be approved to supply and gets set up to accept credit cards.  The final phase is the reciept of formal documentation stating that CITGO is giving a rebate on the location. (D/E #69, p. 3 n. 2).

to three days prior to the invoice.  Here, the first invoice from Knight to BA was for the amount of $16,531.16 and dated January 29, 2004.  As displayed in the summary submitted by the parties as part of Knight's Exhibit #108, that invoice was paid by draft on February 10, 2004, but the draft was also returned because of insufficient funds three days later.  The same day the draft was returned, the amount owed was paid by certified check.

The next invoice, dated February 3, 2004 and for $6,418.02, was paid by draft without a problem, but the third invoice, dated February 6, 2004 and in the amount of $18,368.60, was again returned because of insufficient funds.  Dr. Abdallah subsequently paid the third invoice by certified check.

The fourth invoice, dated February 10, 2004 and for $3,426.43, was paid by draft without a problem, but the fifth invoice, dated February 15, 2004 and in the amount of $6,973.69, was again returned because of insufficient funds.  Dr. Abdallah subsequently paid the third invoice by certified check.  Dr. Abdallah testified that the checks were being returned for insufficient funds because Knight was drafting incorrectly and loads of fuel were being delivered despite not being ordered.

The next two invoices, dated February 19, 2004 and February 24, 2004, were both paid by draft without incident in the amounts of $12,926.75 and $4,416.86 respectively.

The eighth invoice, dated March 1, 2004 and for the amount of $16,020.18, was paid by certified check on the day it was issued.  As displayed in the summary, an invoice dated March

-11-

5, 2004 for $12,080.61 and an invoice dated March 5, 13, 2004 for $19,757.72 were never paid.

Additionally, given other smaller unpaid invoices issued between March of 2004 and October of

2004, a total amount of $25,544.20 is still owed by BA for fuel.

Carroll Knight testified that, during the term of the contract, he personally observed BA

receiving gas from another source.  However, he does not remember the date he observed that

delivery, other than it was on a Sunday, and he does not have any pictures.  Carroll Knight

earlier stated in an affidavit, dated October 28, 2004, that he asked an employee to observe

operations at the gas station, because it appeared the gas station should be requiring more fuel,

and that employee subsequently reported that he observed non-Citgo fuel being delivered to the

gas station and being dispensed from Citgo-branded pumps.[7]

Dr. Abdallah testified that Knight eventually required that BA pay for fuel by certified

check when the invoice was issued.  Dr. Abdallah also testified that Knight refused to deliver

---

[7]The section of Carroll Knight's affidavit discussing his employee's observations is
hearsay, but it was submitted as an exhibit by plaintiffs and was not objected to by defendant.

any more fuel by the end of March of 2004.  In a letter dated March 25, 2004, and submitted as

plaintiff's Exhibit #3, Carroll Knight wrote Dr. Abdallah and stated in part:

> As you are aware, there are some major problems in our business relationship.
> You are out of compliance and credit terms on two delivered loads of fuel.
> Because of your history of NSF drafts it has become necessary that certified funds
> be obtained at or before you receive the next delivery of fuel.  Also all loads of
> fuel - the loads are due for payment in maximum Seven (7) days from delivery.
> Please make payments for those past due loads.
>
> You have gone to other suppliers for your fuel needs and are selling fuel as if it
> was Citgo product, which is a violation of our agreement and the federal
> petroleum act and grounds for terminating our contract with damages.

(Plaintiffs' Exhibit #3).

Following that letter, there were no deliveries of fuel in April of 2004.  However, in May

of 2004, three invoices for fuel deliveries in the amount of over $10,000 each were issued and

paid for by certified check.

The spreadsheet submitted by Knight as part of its Exhibit #108, and not challenged or

refuted by plaintiffs, provides how much fuel was purchased each month.  Overall, BA

purchased 13,401 gallons in January of 2004, 51,850 gallons in February of 2004, 33,450 gallons

in March of 2004, zero gallons in April of 2004, and 16,006 gallons in May of 2004.  As

acknowledged by Dr. Abdallah, BA never purchased 125,000 gallons in any one month.

### B. Procedural History

On October 5, 2004, BA filed a complaint against Knight (D/E #1).  In that eight-count

complaint, plaintiffs request injunctive relief and allege a violation of the PMPA, breach of

-13-

contract, and promissory estoppel.  The injunctive relief plaintiff requests includes the setting aside of a foreclosure sale that took place on September 2, 2004 regarding the real property at 1727 Southfield, Lincoln Park, Michigan.

On November 1, 2004, Knight filed a counterclaim against BA (D/E #7) and, in that counterclaim, Knight also alleges a breach of contract.  Specifically, Knight alleges that BA breached by refusing to reimburse $22,000 or $30,000 on separate occasions as required by the contract.  Knight also seeks liquidated damages as provided in the Franchise Agreement.

On March 21, 2005, Knight filed a third-party complaint against Belal Abdallah, Loubna Abdallah, Hala Berry, and Nabil Berry (D/E #23).  That third-party complaint is based on Knight's allegations that those individuals personally guaranteed the debts of BA under the applicable contracts and are therefore liable as well.

On October 14, 2005, plaintiffs filed a motion for summary judgment (D/E #58).  In that motion, plaintiffs argued that no genuine dispute exists regarding whether Knight breached the Franchise Agreement and Improvement Agreement by failing to tender the $130,000 signing bonus and that plaintiffs are entitled to judgment as a matter of law.  Plaintiffs also argued that no genuine dispute exists with respect to their PMPA claim because Knight failed to give BA the required notice of cancellation of the contract.  Plaintiffs further argued that, given its previous breaches, Knight could not foreclose on the property and they are entitled to summary judgment on that claim as well.

-14-

On April 11, 2006, the Honorable Paul D. Borman  granted BA's motion for summary judgment as to liability, set aside the foreclosure sale, and scheduled a trial date for the issue of damages (D/E #69).  In granting that motion for summary judgment, the district court found that Knight was liable to plaintiffs for breach of contract because it did not pay the signing bonus.  Judge Borman also found that, in light of the failure to pay the signing bonus, Knight violated the PMPA by improperly terminating the contract when there was no basis for immediate termination.  Additionally, the district court found that plaintiffs had no liability to Knight, which rendered the mortgage void.  Judge Borman also subsequently ordered that he would not consider any motions regarding Knight Enterprises' counterclaim on the basis that the issues raised in that counterclaim were intertwined with the damages issues the jury would consider at trial (D/E #73).

The third-party defendants also filed a motion for summary judgment (D/E #57), arguing that, under their plain language, the guaranties were not supported by consideration and do not guarantee BA's performance or debts.  However, Judge Borman subsequently denied that motion:

-15-

> The Court finds that Belal Abdallah, Loubna Abdallah, and Nabil Berry's guaranties were to secure the debt of Plaintiffs. Because these guaranties secured Plaintiffs' debts, the Court finds that there is a genuine issue of material fact as to whether Belal Abdallah, Loubna Abdallah, Nabil Berry are liable to Knight for all or part of Knight's successful claims against BA Construction and BA Real Estate.

(D/E #70, pp. 12-13).   However, Judge Borman also noted that, because he had previously found that BA were not liable to Knight, Knight had no claims against the third-party defendants by way of their guaranties.  (D/E #70, p. 13 n. 5)

The district court conducted a jury trial on March 13, 2007 and March 14, 2007, limited to determining any additional monetary damages that plaintiffs suffered as a result of Knight's breach of contract and violation of the PMPA.  At trial, the jury found in favor of plaintiffs, but did not award any damages because plaintiffs had not suffered any additional damages as a result of Knight's actions (D/E #111, #112).  Knight appealed the order granting summary judgment and the judgment in favor of plaintiff with no award of damages (D/E #113).

On February 17, 2010, the Sixth Circuit issued an opinion as to the appeals in this case. See B.A. Const. and Management, Inc. v. Knight Enterprises, Inc., 365 Fed. Appx. 638, 2010 WL 545504 (6th Cir. 2010).  In that opinion, the Sixth Circuit first found that, because the Improvement Agreement and the Franchise Agreement both referenced the signing bonus and were executed the same day, the district court should have construed the terms regarding the signing bonus in each document as one contract and that, if the district court would have done so, it "would have correctly found that there were two conditions precedent that had to be

satisfied before Knight was obligated to tender the $130,000 signing bonus: (1) plaintiffs' station needed to be formally approved by a major oil supplier; and (2) plaintiffs' station's plans and designs needed Knight's approval." Id. at 642.

With respect to those two condition precedents, the Sixth Circuit found that, while the district court examined the first condition precedent and properly concluded that plaintiffs had received Citgo's approval on March 16, 2004, it failed to analyze the second condition precedent, *i.e.*, that Knight had to approve the plans and designs for the retail outlet. Id. at 642-643. The Sixth Circuit further found that, given the limited factual record before it, genuine issues of material fact existed regarding whether plaintiffs satisfied the second condition precedent and which party was first to substantially breach the parties' agreements. Id. at 643-644. Accordingly, the matter was remanded for further proceedings consistent with that opinion. Id. at 645.

Following remand, the parties consented to this Court's authority to conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings (D/E #141). On December 15, 2010, a status conference was held, with both counsel for the defendants and counsel for the plaintiffs and third-party defendants appearing by phone. During the conference, counsel agreed that, in light of the Sixth Circuit's ruling in this matter, the case should proceed to a bench trial on the issue of defendants' liability and that, if defendants were found liable, then principles such as *res judicata* would bar plaintiff from receiving any damages

-17-

and the trial should end.  Counsel further agreed that, if Knight was not liable after trial, then the matter should proceed with respect to Knight's counter-claim and third-party claim.

On March 25, 2011, the Court and attorneys held a final pretrial conference.  At that conference, counsel for BA and the third-party defendants raised concerns he had regarding the propriety of the third-party complaint.  Subsequently, the third-party defendants filed a memorandum of law regarding the third-party complaint (D/E #146).  In that memorandum, the third-party defendants argue that the third-party complaint should be dismissed because, pursuant to Fed. R. Civ. P. 14, a third-party defendant is only liable to a third-party plaintiff if the third-party plaintiff is liable to the plaintiff and there is no such liability in this case given the outcome of the jury trial.  Knight did not file a response to that memorandum.

On April 1, 2011 and April 19, 2011, a bench trial was held in this matter.

## III. Discussion

### A. Breach of Contract Claims

Both plaintiffs and defendants alleges that the other side breached the contracts described above.  To establish a breach of contract, a party must first establish the elements of a contract.  Pawlak v. Redox Corp., 182 Mich. App. 758, 765, 453 N.W.2d 304 (1990).  A valid contract requires "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation."  Thomas v. Leja, 187 Mich. App. 418, 422, 468 N.W.2d 58 (1991).  The party must then establish the breach of the contract and

damages resulting from the breach.  <u>Alan Custom Homes, Inc. v. Krol</u>, 256 Mich. App. 505, 512,

667 N.W.2d 379 (2003).  "Once a valid contract has been established, a plaintiff seeking to

recover on a breach of contract theory must then prove by a preponderance of the evidence the

terms of the contract, that the defendant breached the terms of the contract, and that the breach

caused the plaintiff's injury."  <u>In re Brown</u>, 342 F.3d 620, 628 (6th Cir. 2003).

Here, valid contracts existed[8] and that both plaintiffs and defendants failed to fulfill all of

their obligations under those contracts.  Therefore, the parties' arguments regarding the breach of

contract claims are dependant on which party was first to substantially breach their agreements.

"The rule in Michigan is that one who first breaches a contract cannot maintain an action against

the other contracting party for his subsequent breach or failure to perform."  <u>Michaels v. Amway</u>

<u>Corp.</u>, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994) (internal citation and quotation marks

omitted).  "However, that rule only applies when the initial breach is substantial."  <u>Id.</u> at 707.  "[A]

'substantial breach' is one 'where the breach has effected such a change in essential operative

---

[8]The Sixth Circuit has found that a contract existed between the parties.  If this court
were deciding that issue in the first instance, it might find that there was no meeting of minds on
all essential terms given the poor manner in which the contracts were drafted and the difficulty in
determining the parties' intent.  In order to form a valid contract, there must be a meeting of the
minds on all essential terms.  <u>Kamalnath v. Mercy Mem Hosp Corp</u>, 194 Mich. App 543, 548;
487 N.W.2d 499 (1992). "'Meeting of the minds' is a figure of speech for mutual assent."  <u>Hall</u>
<u>v. Small</u>, 267 Mich. App 330, 333; 705 N.W.2d 741 (2005).  (quotation omitted).  "A meeting of
the minds is judged by an objective standard, looking to the express words of the parties and
their visible acts, not their subjective states of mind."  <u>Kamalnath</u>, 194 Mich. App at 548,
quoting <u>Stanton v. Dachille</u>, 186 Mich. App 247, 256; 463 N.W.2d 479 (1990).

-19-

elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party.'" Chrysler Int'l Corp. v. Cherokee Export Co., 134 F.3d 738, 742 (6th Cir. 1998) (quoting McCarty v. Mercury Metalcraft Co., 127 N.W.2d 340, 343 (1964)).

BA and the third-party defendants argue that Knight breached the contracts first when it failed to tender the $130,000 signing bonus as required.  However, plaintiff would first have to demonstrate that both the conditions precedent for Knight's performance were met.  The law is clearly settled in Michigan that a "condition precedent is a fact or event which the parties intend to exist or take place before there is a right to performance."  MacDonald v. Perry, 70 N.W.2d 721, 725 (Mich. 1955) (internal citations and quotations marks omitted); see also Archambo v. Lawyers Title Ins. Corp., 646 N.W.2d 170, 176 (Mich. 2002) ("A 'condition precedent' is a condition that must be met by one party before the other party is obligated to perform[.]").

As found by the Sixth Circuit, there were two conditions precedent that had to be satisfied before Knight was obligated to tender the $130,000 signing bonus: (1) plaintiffs' station needed to be formally approved by a major oil supplier; and (2) plaintiffs' station's plans and designs needed Knight's approval.  With respect to the first condition precedent, both Judge Borman and the Sixth Circuit found that Citgo, a major oil supplier, had formally approved the gas station for branding.  Likewise, during the bench trial, Carroll Knight expressly testified that

-20-

Citgo had approved the station.  Therefore, the first condition precedent for paying the signing bonus was satisfied.

In the second condition precedent, Knight's obligation to pay the $130,000 signing bonus was dependent upon Knight's approval of the plans and designs for the Retail Outlet.  However, it is clear that the second condition precedent was not met in this case.  While both Dr. Abdallah and Carroll Knight testified that they had some discussion regarding Dr. Abdallah's ideas for the inside of the gas station, no specific plans were ever submitted or approved by Knight.  The few steps that plaintiffs did take with respect to expanding the gas station, such as speaking with Blimpie's about putting one of its franchises in the Retail Outlet, were completely unknown to Knight.  Given the other difficulties Knight was having with plaintiff's performance, the plans were not at the forefront of the dealings between the parties and Knight never specifically demanded any plans.  Nevertheless, the lack of demand for any specific plans does not constitute a waiver of the second condition precedent and it is clear that no plans were ever submitted or approved.

Plaintiffs appear to argue that, given Citgo's approval of the station and the language of the Improvement Agreement suggesting that approval was primarily for the purpose of ensuring that Retail Outlet maintained the integrity and value of Citgo's trademark and brand names, Knight's reason for requiring approval was met.  However, Citgo's general approval of the station does not constitute approval of the Retail Outlet by Knight, especially where no plans

-21-

were ever submitted or approved.  Moreover, even if the primary reason for requiring approval

was to maintain the integrity and value of trademarks and brand names, that was not Knight's

sole reason for requiring that approval.  As testified to by Carroll Knight, such plans would

confirm that BA had credibility, reflect how it was going to do business, and demonstrate that it

was going to be in business for a long time.  Plaintiffs' argument conflates the two condition

precedents and ignores the reasons Knight alone possessed for approving any plans and designs

for the retail outlet.

　　　　As discussed above, Knight's obligation to pay the $130,000 signing bonus was, in part,

dependent upon Knight's approval of the plans and designs for the Retail Outlet.  However, no

such plans were submitted to or approved by Knight.  Accordingly, the second condition

precedent was not satisfied and Knight did not breach the contracts by failing to pay the entire

signing bonus.

　　　　In addition to finding that Knight did not breach the contracts by failing to pay the entire

signing bonus, this Court also concludes that BA substantially breached the contracts first

through its improper actions.  For example, the Franchise Agreement required that plaintiffs

purchase a minimum number of gallons of motor vehicle fuel each month and plaintiffs failed to

purchase that requisite amount of fuel during every month relevant to this action.  Dr. Abdullah

testified that he told Carroll Knight that it would take some time before the gas station would

require the minimum number of gallons specified in the contract, but the clear language of the Franchise Agreement does not reflect such a discussion.

Similarly, plaintiffs failed to comply with the provisions of the Franchise Agreement regarding the terms and methods of payment. The contract provided that Knight would draw payments from plaintiffs' designated bank account at the time payments were due, but checks issued to Knight from plaintiffs were repeatedly returned due to insufficient funds. Dr. Abdullah testified that Knight improperly billed plaintiffs and delivered fuel without it being ordered, but there is no evidence supporting such testimony and the testimony is not credible in light of that lack of evidentiary support, Dr. Abdullah's acknowledgment that he was not present during any unauthorized deliveries, and the fact that Dr. Abdullah never raised this issue before. Moreover, while Dr. Abdullah subsequently paid some amounts owed by certified check, $25,544.20 of fuel was never paid for. That lack of payment, along with the returning of checks due to insufficient funds, constituted another breach of the contracts by plaintiffs.

The third substantial breach of the contracts occurred when plaintiffs purchased motor fuel from another supplier. Pursuant to the Franchise Agreement, Knight was to be the exclusive supplier of motor fuel to plaintiffs during the term of the contract. However, the uncontradicted testimony and affidavit of Carroll Knight provide that plaintiffs were being supplied with motor fuel by another supplier on at least one occasion, as observed by Carroll Knight and one of his employees.

-23-

Together,  those improper actions by BA constitute the first substantial breach of the contracts.  Therefore, Knight can maintain its breach of contract claims against BA and BA is liable on those claims.

**B. Damages**

The general rule is that a remedy for breach of contract should make the nonbreaching party whole or "place the nonbreaching party in as good a position as if the contract had been fully performed."  Corl v. Huron Castings, Inc., 450 Mich. 620, 625–626, 544 N.W.2d 278 (1996).  Put another way, n an action based on contract, the parties are entitled to the benefit of the bargain as set forth in the agreement.  Davidson v. Gen. Motors Corp., 119 Mich. App. 730, 733, 326 N.W.2d 625 (1982), mod. on other grounds on reh. 136 Mich. App. 203, 357 N.W.2d 59 (1984).  The proper measure of damages for a breach of contract is "the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached."  Id.

Here, with respect to the benefit of the bargain, the Franchise Agreement expressly provides that the amount of Knight's losses would be difficult to determine in the event that BA breached and, therefore, it also contains a liquidated damages provision addressing a breach by BA.  However, the exact amount of those liquidated damages is unclear as the contractual language contains conflicting provisions and differs from the testimony from trial as well.   As discussed above, the Franchise Agreement states: "upon any repudiation by [BA], [BA] shall pay to Knight as liquidated damages, three cents per gallon multiplied by the minimum gallons" set

-24-

forth in the contract.  However, in his testimony during trial, Carroll Knight testified that the liquidated damages would be computed at three cents a gallon for *unpurchased* fuel  based on the contract.  Carroll Knight's testimony may make more sense, as it does not require BA to pay for any fuel twice, but that is not what the plain language of the contract states.

Moreover, even the minimum number of gallons that BA was required to purchase under the contract, which would be essential in computing the liquidated damages under either method, is unclear.  The Franchise Agreement states that BA is to purchase at least 125,000 gallons a month while also providing, in different parts , that the term for the contract is both for ten and fifteen years.  With respect to the total amount that needed to be purchased, the parties crossed out the 15 million gallons provided for in the standard contract and replaced it with 12 million gallons of motor fuel.  However, regardless of which term of years are used, purchasing a minimum of 125,000 gallons a month does not add up to an exact minimum of 12 million gallons over either 10 or 15 years (purchasing 125,000 gallons a month for 10 years does add up to the originally-written 15 million gallons).

This Court would also note that the difficulty in determining the amount of liquidated damages is reflected in Knight's shifting claims for damages.  For example, while Knight requested $360,000 in liquidated damages in its counterclaim, it later requested $240,000 as liquidated damages in the joint final pretrial order and $288,000 in liquidated damages in its proposed findings of facts.

-25-

Determining the minimum number of gallons BA was required to purchase and whether to subtract the number of gallons BA actually purchased are essential to computing the liquidated damages in this case.  However, given the conflicting contractual provisions and testimony , it is impossible to make those essential determinations or construe the intent of the parties.  Consequently, the liquidated damages provision cannot be enforced.

As provided in the liquidated damages provision, however difficult to construe, the parties acknowledge that Knight's losses would be difficult to determine if BA breached the contracts.  Additionally, no evidence was produced at trial regarding loss profits or the expected benefit of the bargain.  Therefore, the expectation damages are too difficult or speculative to determine in this case and Knight should instead be awarded its reliance damages.  Such damages would, to the extent possible, put Knight in the same position it would have been in had the contract never been made.  See, *e.g.*, Earl Dubey & Sons, Inc. v. Macomb Concrete Corp., 81 Mich. App. 662, 680, 266 N.W.2d 152, 160 (Mich. App. 1978) (holding that where profits are speculative or unprovable, the measure of damages is the actual expenditures and value of services reasonably spent in a bona fide attempt to perform the contract or reasonably expended upon the faith of the contract)

Here, the damages Knight incurred in reliance on the contracts include (1) the $12,316.86 Knight paid for materials and contractors; (2) the $30,000 Knight paid as an advancement of the signing bonus; and (3) the $25,544.20 worth of unpaid fuel provided by Knight to BA.  Such

damages, in the total amount of $67,861.03, will not give Knight the benefit of its bargain, but they will, plus interest, put Knight in the same position it would have been in had the contract never been made.

### C. Personal Guaranties

In its third-party complaint, Knight alleges that Dr. Abdallah, Loubna Abdallah, Nabil Berry and Hala Berry personally guaranteed BA's debts under the contracts and would therefore be liable if plaintiffs are unable to satisfy the judgment.  This court concludes that Belal Abdallah, Loubna Abdallah, Nabil Berry and Hala Berry are so liable.

As a preliminary matter the third-party defendants correctly argue that Knight's claims against them should have been brought in its counter-claim rather than as a third-party complaint.  Fed. R. Civ. P. 14(a)(1) provides in the relevant part that a "defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it."  As found by the Sixth Circuit:

> Third-party pleading is appropriate only where the third-party defendant's liability to the third-party plaintiff is dependent on the outcome of the main claim; one that merely arises out of the same set of facts does not allow a third-party defendant to be impleaded.  A defendant attempting to transfer the liability asserted against him by the original plaintiff to the third-party defendant is therefore the essential criterion of a third-party claim. Correlatively, a defendant's claim against a third-party defendant cannot simply be an independent or related claim, but must be based upon the original plaintiff's claim against the defendant.

Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co., 512 F.3d 800, 805 (6th Cir. 2008).

-27-

Here, Knight filed a third-party complaint against Belal Abdallah, Loubna Abdallah, Hala Berry, and Nabil Berry on the basis that those individuals personally guaranteed the debts of BA under the applicable contracts and that BA subsequently breached the contracts. However, those allegations fail to allege the basis for a third-party complaint, where the third-party defendant is alleged to be liable for all or part of the claim the plaintiff has against the defendant/third-party plaintiff.  See Am. Zurich Ins. Co., 512 F.3d at 805 ("A defendant attempting to transfer the liability asserted against him by the original plaintiff to the third-party defendant is therefore the essential criterion of a third-party claim.")  Additionally, even if Knight had stated a valid third-party complaint, a jury previously found that plaintiffs suffered no damages and, consequently, Knight has no damages to seek against the third-party defendants based on plaintiffs' claims against Knight.

Nevertheless, Knight should be allowed to amend its counter-claim to properly plead its claims against Abdallahs and Berrys rather than having those claims dismissed due to a technical violation. Knight's allegations may have been in the wrong type of pleading, but they have also been consistent and the third-party defendants have been on notice of the claims against them since the early stages of the case.  Moreover, the Abdallahs and Berrys would not be prejudiced in any way by an amendment as they conducted discovery on Knight's claims and defended against those claims at trial.  Knight's counter-claim should have been amended earlier, but this Court will allow it now in light of the notice and lack of prejudice.

-28-

The personal guaranties themselves were provided as Knight's Exhibits 104-107 during trial. With respect to those exhibits, the Abdallahs acknowledge that they signed Exhibits 105 and 106 respectively while the Berrys deny signing Exhibits 104 and 105. However, this Court concludes that Nabil Berry signed the Guaranty submitted as Exhibit 104 and Hala Berry signed the Guaranty submitted as Exhibit 107. Both signatures were notarized and the notary, Wahab Ismail, credibly testified that, while he does not recall the Berrys signing the forms, he would not have notarized the signatures without verifying the identity of the person signing and actually observing the signing. Moreover, contrary to the deposition testimony provided by the Berrys at trail, Nabil Berry previously stated at an earlier Deposition that both he and his wife both signed a guaranty.

With respect to the content of the guaranties, the third-party defendants briefly argued at the end of trial that the guaranties were not supported by consideration and do not guarantee BA's debts. However, they also raised those arguments earlier and the arguments were expressly rejected by Judge Borman. As found by Judge Borman, while the guaranties contain mistakes in expressing the parties' intent, the evidence and record conclusively established that the third-party defendants guaranteed the debts of BA (D/E #70, pp. 10-13). Judge Borman's ruling remains the law of the case and it remains binding here. The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Scott v. Churchill, 377 F.3d 565, 569–70

-29-

(6th Cir. 2004) (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d

318 (1983)).  The doctrine precludes a court from reconsideration of issues "decided at an early

stage of the litigation, either explicitly or by necessary inference from the disposition."  <u>Hanover</u>

<u>Ins. Co. v. Am. Eng'g Co.</u>, 105 F.3d 306, 312 (6th Cir. 1997) (quoting <u>Coal Res., Inc. v. Gulf &</u>

<u>Western Indus., Inc.</u>, 865 F.2d 761, 766 (6th Cir. 1989)).

       Thus, "[t]he law of the case doctrine precludes reconsideration of a previously decided

issue unless one of three 'exceptional circumstances' exists."  <u>Westside Mothers v. Olszewski</u>,

454 F.3d 532, 538 (6th Cir. 2006).  These are "(1) where substantially different evidence is

raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the

controlling authority; or (3) where a decision is clearly erroneous and would work a manifest

injustice."  <u>Id.</u> (citation omitted).  No such exceptional circumstance exist here and this Court

concludes that Dr. Belal Abdallah, Loubna Abdallah, Nabil Berry and Hala Berry each

personally and individually guaranteed BA's debts.

## IV. Conclusion

       For the reasons discussed above, this Court concludes:

(1)  BA never submitted and Knight never approved any plans for the Retail
Outlet. Accordingly, the second condition precedent for payment of the signing
bonus was not satisfied and Knight did not substantially breach the contracts by
failing to pay BA the signing bonus.

(2)  BA substantially breached the contracts first by failing to purchase the minimum amount of fuel each month, having checks returned for insufficient funds, failing to pay for the fuel, and purchasing fuel from other suppliers

(3)  Knight's expectation or liquidated damages are too difficult or speculative to determine, and it should instead be awarded reliance damages in the amount of $67,861.03, plus interest.

(4)  Bela Abdallah, Loubna Abdallah, Nabil Berry and Hala Berry each personally and individually guaranteed BA's performance and debts under the contracts.  Accordingly, those individuals would be liable if BA is unable to satisfy the judgment.

s/Virginia M. Morgan
VIRGINIA M. MORGAN
UNITED STATES MAGISTRATE JUDGE

Dated:  April 27, 2011

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 27, 2011.

s/Jane Johnson
Deputy Clerk